UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

UNITED STATES OF AMERICA )
)
V. ) No. 2:10-CR-24
)
RAYMOND D. ARWOOD )

# REPORT AND RECOMMENDATION

Defendant is charged with being a convicted felon in possession of a .410-gauge shotgun, ammunition for that shotgun, and .40 caliber ammunition for a handgun. The shotgun and the ammunition were found and seized on April 16, 2009, by two Hamblen County deputies during a warrantless search of defendant's residence.

Defendant has filed a motion to suppress evidence of the shotgun and the ammunition, claiming their warrantless seizure was in violation of the Fourth Amendment. (Doc. 13). The United States claims that the defendant consented to the search that led to the discovery of the weapon and the ammunition.

The motion has been referred to the magistrate judge pursuant to the standing order of this Court and 28 U.S.C. § 636. A hearing on defendant's motion was held on April 23, 2010.

*FACTS*

The court was never advised of the nature of defendant's felony conviction, but it obviously was the result of a sexual offense of some sort. Whatever the specific nature of his crime and ultimate conviction, defendant was required to register under Tennessee's

Sexual Offender Registration and Monitoring Act, Tenn. Code Ann. § 40-39-201, *et. seq*. The Tennessee Bureau of Identification is charged with the responsibility of creating and maintaining the Sexual Offender Registry, Tenn. Code Ann. § 40-39-204. Part of the information to be maintained by the TBI in the registry is the defendant's address. Since defendant lived in Hamblen County, it was the responsibility of the Hamblen County Sheriffs Department to verify that defendant still lived at the address listed for him in the Sexual Offender Registry.

When defendant first became obligated to register as a sex offender, Leanna Barr was the Sexual Offender Registry Clerk for the Hamblen County Sheriffs Department. During her initial conference with defendant, she went over his "conditions" with him; although she never said anything about periodic searches of his house, she did tell him that he was obligated to answer an officer's questions. There is nothing in the act that specifically requires a sex offender to answer any questions of a police officer, and neither is there any provision in it that authorizes officers to conduct warrantless searches of the offender's home. If there is a regulation of some state agency that addresses either of these issues, the act says nothing about such a regulation, and the United States did not bring it to the court's attention.

In late 2005 or early 2006, defendant resided on Eller Road in Hamblen County. At 1:00 a.m. on a particular night during this time frame, the defendant heard a knock on his door. When the opened the door, he saw Ms. Barr and a Hamblen County Deputy standing on his porch. Upon seeing a deputy sheriff and a Sheriffs Department employee standing on

his porch at 1:00 a.m., defendant understandably asked if anything was wrong. Ms. Barr told defendant that she was there to conduct a "random house check." That prompted defendant to ask Ms. Barr what that meant, to which she responded that since he was on the Sexual Offender Registry, officers were required to periodically inspect his premises to confirm that he was in compliance with the conditions imposed upon him as a sexual offender. Ms. Barr made it clear to defendant that he had no right to refuse this inspection.

Primarily, Ms. Barr wished to confirm that there were no children in the house;[1] she and the officer did not search the house to the extent of opening drawers and the like, but they did do a "walk through" to look for children's toys, clothing, or anything else that would suggest that a child was in the house.

The door to one room was closed, prompting Ms. Barr to ask defendant who or what was in that room. Defendant's wife, who by that time was out of bed, responded that the bedroom was used by her daughter, who was then attending college in Alabama. Ms. Barr thereupon remarked that the child was obviously over eighteen years of age and expressed no further interest in the room.

In approximately August 2007, Ms. Barr and a deputy again made an unannounced visit to defendant's residence on Eller Road, this time at approximately 2:00 p.m. in the afternoon. As before, Ms. Barr and the deputy entered the house and looked around, neither asking nor receiving permission to do so.

---

[1] Defendant could not reside where there also resided any minor child not his own, Tenn. Code Ann. § 40-39-211(c).

Approximately a year later, Terri Epps had replaced Ms. Barr as the Sexual Offender Registry Clerk. Ms. Epps sent two uniformed officers to defendant's residence to conduct an inspection similar to those in the prior years. Because of the two earlier visits, defendant concluded that the officers had the right to enter his house, as a result of which he admitted them without objection.

On none of these three "inspections" did the officers find incriminating evidence of any crime, sexual or otherwise.

In April 2009, defendant had a dispute with his neighbor regarding the location of the property line between them. That dispute evolved into a confrontation. The neighbor called the Sheriffs Department to make a complaint, during which he reported that defendant had a gun. On April 14, two officers were dispatched. They first talked to the neighbor, and then to the defendant. Apparently the dispute was resolved to the officers' satisfaction, but not the neighbor's; two days later, on April 16, he went to the Sheriffs Department and personally talked with the Chief Deputy. The Chief Deputy called Ms. Epps to confirm that defendant was a convicted sexual offender, and Ms. Epps so confirmed. The Chief Deputy then asked Ms. Epps to perform an "address verification." [2]

Ms. Epps instructed two deputies, Jimmy Standifer and Jose Peralez, to go to

---

[2]Frankly, the Chief Deputy's request to Ms. Epps made no sense if his request indeed was to obtain only a verification of defendant's arrest. Obviously, the defendant lived at the same address, since his neighbor was there at that very instant complaining of the dispute between defendant and him regarding their property line. A far more plausible conclusion is that the Chief Deputy was interested in defendant's alleged possession of a firearm.

defendant's house to perform the "address verification." Defendant was outside his house when the deputies arrived, and it is at this point that the testimonies of the actors starkly diverge. Defendant testified that Deputy Standifer opened the doors to, and entered, outbuildings without asking permission to do so, going so far as to ask what was in an old United States Army ammunition box on a shelf in a storage building. Deputy Standifer and Peralez, on the other hand, flatly denied that they entered any outbuildings, and Deputy Standifer further testified that the first he had heard of the ammunition box was when asked about it by defendant's attorney. The testimonies of Deputies Standifer and Peralez, and the testimony of the defendant, regarding the officers' actions outside the house cannot be reconciled. It is unnecessary, however, to resolve those discrepancies since there is no dispute concerning the facts immediately relevant to defendant's motion to suppress.

While standing outside the house, Deputy Standifer asked defendant if there were any weapons in the house. Defendant testified that he answered this question truthfully by telling them that his wife owned a .410 gauge shotgun. Standifer then asked defendant if he could see the firearm; defendant agreed and said that he would get it. Standifer asked defendant if he could accompany him when he went into the house to get the weapon, and again defendant agreed. Defendant and Standifer went into a bedroom in the house, and the shotgun, in a zipped bag, was pulled from beneath the bed.

A subsequent search revealed shotgun shells in a night stand drawer beside the bed, along with thirty-six .40 caliber handgun cartridges. No handgun was found. Standifer also observed in plain view some more shotgun shells on a table.

**ANALYSIS**

Defendant's status as a convicted felon did not *ipso facto* strip him of any rights he has under the Fourth Amendment. Nevertheless, a probationer or supervised releasee may be subject to warrantless searches if the relevant governmental authority , *e.g.*, the state, has regulations that provide for search searches. *Griffin v. Wisconsin*, 583 US 868 (1987) ; *U.S. v. Downs*, 1999 WL 130786 (6th Cir. 1999). It is presumed that defendant was not serving a sentence of probation and that he was not on parole regarding a prior conviction; otherwise, the United States would have presented proof that he was. And even if his status as a convicted sex offender may be equated with probation or parole for purposes of warrantless searches, there is no provision in Tennessee's Sex Offender Registration and Monitoring Act that requires a convicted sex offender to submit to periodic warrantless searches of his residence. Therefore, the issue in this case is straightforward : Did the defendant voluntarily consent to this search?

A search conducted pursuant to a consent is of course a recognized exception to the Fourth Amendment's requirement for a warrant; *see, Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). However, when the police seize evidence during a warrantless search, the prosecution must show by a preponderance of the evidence, through "clear and positive testimony," that the defendant validly and voluntarily consented to the search. *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999). The consent must be "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion." *Id.*, 386. In determining whether consent is validly given "is a fact-specific inquiry that must be

determined by the totality of the circumstances." *Id.*

Defendant argues that he believed that he had no choice other than to submit to the "house checks," and that he also was obligated to answer any questions asked by the police during those checks. The United States argues that "ignorance of the law is not a defense," citing *United States v. International Minerals & Chemical Corp.*, 402 U.S. 558, 563 (1971), and therefore defendant's erroneous belief that he was required to answer Deputy Standifer's questions is irrelevant.

There was nothing inappropriate about Deputy Standifer's question to defendant regarding a gun in the house. The issue, however, is the validity - or voluntariness, if you will - of his response that there was indeed a gun in the house, as well as the validity of his consent that the officers enter his house.

Defendant was "ignorant" of the law, i.e., his rights, to the extent that he was under the misapprehension that he had no choice. That misapprehension, however, was the product of prior visits and statements by representatives of the Hamblen County Sheriffs Department.

A consent is not voluntary if it is given in response to a *false* threat that a search warrant will be obtained if the consent is withheld. *See, e.g., United States v. White*, 979 F.2d 539, 542 (7th Cir. 1992).[3] Similarly, a consent based upon an officer's false representation that he possesses a warrant is no consent at all:

> When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be

---

[3]Cited in *United States v. Salvo*, 133 F.3d 943, 954 (6th Cir. 1998).

> discharged by showing no more than acquiescence to a claim of lawful authority. A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid. The result can be no different when it turns out that the State does not even attempt to rely upon the validity of the warrant, or fails to show that there was, in fact, any warrant at all.

*Bumper v. North Carolina*, 391 U.S. 543, 548-550 (1968). There is no difference between an officer's misrepresentation regarding his intent to procure a warrant and his misrepresentation (by word or action) of his authority to conduct warrantless house checks and to require a convicted sex offender to answer his questions. In either situation the defendant's consent cannot truly be said to be valid and voluntary.

Both by word and deed, representatives of the Hamblen County Sheriffs Department made it clear to defendant that he was required to submit to random house checks. Although those "house checks" may have been rather cursory walk-throughs, they nevertheless involved an entry and a search. Ignorance of the law indeed is no defense or excuse. But this was not mere ignorance; it was misinformation actively communicated by a law enforcement officer to the defendant, which is substantially the same as a consent to search obtained on the basis of a false representation by the officer that he has a search warrant.

It should be noted that the erroneous information imparted to defendant by the Hamblen County Sheriffs Department would not necessarily taint or invalidate every consent to a search given by defendant in every situation. For example, had the two deputies who interviewed defendant and his neighbor on April 14 asked defendant if he had a weapon in the house, his affirmative response and subsequent permission to enter his house to retrieve

8

it likely would be upheld because on April 14 the officers' visit had nothing to do with the Sexual Offender Registry, but rather was attributable to a complaint lodged against defendant by his neighbor. However, the question asked of defendant on April 16 was in the context of an "address verification," which defendant rightly considered and answered in light of his prior experience. Defendant's answer to Standifer's question, and his purported consent that Standifer enter his home, were tainted by that prior experience through no fault of his.

The United States failed to carry its burden of proving that defendant's consent was voluntary.

It is respectfully recommended that defendant's motion to suppress, (Doc. 13), be granted.[4]

Respectfully submitted,

s/ Dennis H. Inman<br>United States Magistrate Judge

---

[4] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).